[No. 23737. Department Two. August 17, 1932.]

MARTIN WOLDSON *et al., Respondents,* v. DAVENPORT MILL & ELEVATOR COMPANY *et al., Appellants.*[1]

[1]Reported in 13 P. (2d) 478.

*J. Speed Smith* and *Henry Elliott, Jr.*, for appellants.

*Davis, Heil & Davis*, for respondents.

MILLARD, J.—This action was brought by the plaintiff against the Davenport Mill & Elevator Company and the surety upon the statutory bond of the latter to recover for the conversion of wheat against which the warehouseman had issued negotiable warehouse receipts which were held by the plaintiffs as collateral security for the payment of a loan of money. A trial of the cause to the court resulted in findings and judgment in favor of the plaintiffs. The defendants appealed.

From August 22, 1929, to May 3, 1930, wheat was stored in the warehouse of the Davenport Mill & Elevator Company, at Davenport, by H. A. Bursch and four other persons, to whom the warehouse company issued seven negotiable warehouse receipts for the wheat. The receipts issued by the warehouse company were in the following form, differing only as to the date, amount and kind of wheat stored, number of the receipt and the name of the depositor:

"Warehouse No. 872. Official Bonded Warehouse Receipt No. 169

"Davenport Mill & Elevator Company
"Davenport, Washington          May 3, 1930.

"This is to certify that we have received and hold in storage Bulk Sacks, (83583 pounds), (59 test), of Hard Federation Wheat and will deliver same to H. A. Bursch, or order at this elevator upon the surrender of this receipt, and payment of charges and advances

as indicated below: Provided, however, that the said grain is held at owner's risk of fire and is subject to owner's risk from unavoidable damage. The makers of this receipt will not be responsible for weights or grades except at the elevator where issued, it being mutually understood and agreed that this wheat may be mixed or mingled with other wheat of same grade and quality and that any other wheat of same grade and kind may be delivered in place of this wheat. This grain is accepted for storage upon condition ·that the holder hereof, or the depositor, shall demand the delivery of same not later than following July 1 after date of this receipt. Dockage (......per cent......) Advance $................. (...........per cent smut) Handling charges, $1.25 per ton. Storage charges, 10 cents per ton per month or fraction thereof, 30 days from date received.

"Partial deliveries noted on back of this receipt.
"DAVENPORT MILL & ELEVATOR COMPANY,
"By John Fry, Receiving Agent."

During April and May, 1930, the warehouse company purchased that wheat from the holders of the receipts. Those receipts were indorsed in blank by the holders and surrendered to the warehouse company. In April and May, 1930, the warehouse company borrowed an aggregate of forty-five hundred dollars from the respondents. On June 24, 1930, the loans were renewed, and as collateral security for the payment thereof, the warehouse company indorsed the seven receipts and delivered the same to the respondents. On the back of each receipt is printed the following:

"STATEMENT OF OWNERSHIP AND ENCUMBRANCES
"The undersigned hereby certifies on the date stated that he is the owner, or authorized agent of the owner, of the grain covered by this receipt and that, other than the warehouseman's lien evidenced on the fact of this receipt and the following, there are no liens, mortgages, or other encumbrances on said grain.
.............................................................................19........
"(Signed)........................................................
"ENDORSEMENTS"

Below the word "ENDORSEMENTS" appear the signature of the depositor of the wheat and the signature of the warehouse company by its manager.

The respondents accepted the warehouse receipts with knowledge that the warehouse company had purchased the wheat from the receipt holders. Unknown to the respondents, the wheat represented by the receipts was converted during April and May, 1930, by the warehouse company, which ground the wheat into flour or shipped it out of the warehouse.

There was testimony that, about August 29, 1930, the respondents demanded of the warehouse company that it start shipping the wheat described in the seven warehouse receipts held by the respondents as collateral security for the loan to the warehouse company. The company's receiving agent testified that the respondents did not tender the receipts to the warehouse company; that the respondents had the receipts with them, and "were going to surrender them and then they talked it over and decided they would not." The respondents returned to Spokane from Davenport, and did not, on August 29, 1930, or at any other time, insist upon delivery of the wheat.

There is testimony, also, that all of the wheat could not have been, had the respondents so demanded, delivered out of the warehouse on August 29, 1930, as the warehouse did not have at that time in storage sufficient wheat of the quality covered by the receipts. Thereafter, respondents instituted this action, the trial of which resulted as recited above.

Appellants contend that the warehouse company's transactions were not in compliance with the statute, in that, first, the negotiable warehouse receipts were not cancelled at the time the warehouse company purchased the wheat from the receipt holders; and second, the receipts held as collateral security by the

respondents did not disclose that the wheat represented by those receipts was owned by the warehouse company. Therefore, it is insisted, the respondents can not recover, as the warehouse receipts were illegal, and were taken by the respondents with knowledge of their illegality.

The provisions of the statute invoked by the appellants read as follows:

"Warehouse receipts need not be in any particular form, but every such receipt must embody within its written or printed terms: . . .

"(h) If the receipt is issued for goods of which the warehouseman is owner, either solely or jointly or in common with others, the fact of such ownership; . . .

"A warehouseman shall be liable to any person injured thereby, for all damage caused by the omission from a negotiable receipt of any of the terms herein required." Rem. Comp. Stat., § 3588.

"Where there are deposited with or held by a warehouseman goods of which he is the owner, either solely or jointly, or in common with others, such warehouseman or any of his officers, agents, or servants who, knowing this ownership issues or aids in issuing a negotiable receipt for such goods, which does not state such ownership, shall be guilty of a gross misdemeanor." Rem. Comp. Stat., § 3639.

"Where a warehouseman delivers goods for which he had issued a negotiable receipt, the negotiation of which would transfer the right to the possession of the goods, and fails to take up and cancel the receipt, he shall be liable to anyone who purchases for value in good faith such receipt, for failure to deliver the goods to him, whether such purchaser acquired title to the receipt before or after the delivery of the goods by the warehouseman." Rem. Comp. Stat., § 3597.

We can not agree with the appellants that the receipts were void because they were not cancelled when the warehouse company purchased the wheat,

and because the receipts were issued for goods owned by the warehouse company without stating the facts of such ownership, in violation of § 3588, *supra.*

In the receipts was a statement that the wheat received by the warehouse company would be delivered to the order of the person named in each receipt, therefore the receipts were negotiable. Rem. Comp. Stat., § 3591. A warehouse receipt is the evidence of title to the goods represented thereby, and follows such goods throughout. The receipts issued by the warehouse company could be negotiated by the owners thereof or by any person to whom the possession or custody of the receipts had been intrusted by the owners. Rem. Comp. Stat., § 3626. The omission from the receipts of some of the terms prescribed in § 3588, *supra,* would not invalidate such receipts or render them non-negotiable.

Following the provision that no particular form shall be necessary for warehouse receipts, the statute prescribes the incorporation of certain terms in such receipts for the protection of the depositor or those to whom the depositor negotiates the receipts. That such terms were required for the protection of the depositor and those succeeding to his rights, is reflected by the provision that the omission from a negotiable receipt of any of those terms would not absolve the warehouseman from liability to any person injured by such omission.

In *Laube v. Seattle Nat. Bank,* 130 Wash. 550, 228 Pac. 594, it was contended that, under § 3588, *supra,* warehouse receipts which failed to state the location of the warehouse where the goods were stored were invalid. Holding the contention untenable, we said:

"The validity of a warehouse receipt issued under the statute of Illinois, it being the uniform warehouse receipts act containing the exact provisions of our act

above quoted, was drawn in question in *Manufacturers' Mercantile Co. v. Monarch Refrigerating Co.*, 266 Ill. 584, 107 N. E. 885. It was there contended that a warehouse receipt which failed, among other things, to embody some of the terms as prescribed in the portions of the act above quoted was invalid and non-negotiable, conferring no rights upon the one to whom it was issued or to the one to whom it was transferred. Holding that these omissions did not affect the validity of the receipt nor its negotiability, nor the rights of the one to whom it was issued or transferred, Justice Dunn, speaking for the court, observed:

" 'The requirements of section 2 were imposed for the benefit of the holder of the receipt and of the purchasers from him. It was not intended that a failure to observe them should render the receipt void in the hands of the holder. The appellee contends that such failure had the effect to render the receipts non-negotiable. Section 2 does not deal with the negotiability of warehouse receipts. After providing that no particular form shall be necessary for warehouse receipts, it prescribed certain terms to be embodied in them for the protection of the depositor or his assigns, and that it was for the protection of such persons that these terms were required is indicated by the provision that their omission from a negotiable receipt should render the warehouseman liable for all damages to any person injured thereby. This provision is inconsistent with the claim that the omission renders the receipt non-negotiable, for it refers expressly to the omission from a negotiable receipt and not from a receipt which would otherwise be negotiable. The distinction between negotiable and non-negotiable receipts is stated in sections 4 and 5. A receipt which states that the goods will be delivered to the depositor or another specified person is non-negotiable; one which states that they will be delivered to the bearer or to the order of a person named in the receipt is negotiable. These receipts came within the definition of the last class and were negotiable.' "

The receipts stated the wheat was subject to the order of the depositors on payment of all charges and

surrender of the receipts. The wheat was sold to the warehouse company by the holders of the receipts, which were indorsed in blank by their owners and surrendered to the warehouse company. The warehouse company, in turn, indorsed the receipts and delivered them to the respondents.

By its indorsement and delivery of the receipts to the respondents, the warehouse company declared that it owned the wheat, that the ownership of the wheat was transferred to the respondents, and that the wheat was in storage in the warehouse of the warehouse company subject to the order of the respondents. That is, the warehouse company, by negotiation and delivery of the receipts, declared that it held the wheat as bailee for the respondents, and not as bailee for itself. Each receipt carried on its face notice of the warehouse company's ownership of the wheat and the transfer of that ownership to the respondents.

The purpose of the statute is fully met when there is anything on the receipt which by fair implication states the warehouseman is the owner of the goods represented by the receipt. *Cowley County Nat. Bank v. Rawlins-Dobbs Elevator Co.,* 96 Kan. 461, 152 Pac. 647. The situation would be no different if the receipts had been indorsed to John Doe and he to Richard Roe and Roe to the respondents. There is nothing in the statute which forbids the purchase of the wheat by the warehouse company from the receipt holders and the transfer of the receipts by the warehouse company to the respondents.

There is no provision in the statute for the issuance of a new receipt. Cancellation is required only when the goods are taken out of the warehouse. Rem. Comp. Stat., § 3597. When a part of the goods is delivered, the warehouseman must state on the receipt what goods were delivered, or he must cancel the receipt. Rem.

Comp. Stat., § 3598. The warehouse company was not required by the statute to cancel the receipts at the time it purchased the wheat from the receipt holders, as there was no delivery of the wheat out of the warehouse.

It is finally contended that respondents can not recover, as they failed to make a demand for delivery of the wheat and failed to tender to the warehouseman the receipts for the wheat.

There is evidence that, when the renewal note was made on June 24, 1930, the warehouseman had converted the wheat. As recited above, there was testimony also that, on August 29, 1930, the warehouseman could not have made delivery of the wheat had the respondents so demanded. The warehouse company placed it beyond its power to comply with any demand, upon the presentation of the warehouse receipts and tender of storage charges, therefore no demand was necessary as a requisite to bringing action for conversion.

"No demand is necessary as a requisite to bringing action for conversion where the warehouseman has placed it out of his power to comply with such demand, as a result of reducing the amount of stored wheat very greatly below the amount called for by outstanding receipts, since there is an impossibility of compliance, and a vain and useless act is not required of a depositor and receipt holder." *State ex rel. Reitmeier v. Oakley,* 129 Wash. 553, 225 Pac. 425.

The judgment is affirmed.

TOLMAN, C. J., HOLCOMB, MAIN, and BEALS, JJ., concur.